**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 14, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

# UNITED STATES COURT OF APPEALS

# TENTH CIRCUIT

---

ARIZONA PUBLIC SERVICE
COMPANY,

     Petitioner,

v.                                                                      No. 07-9546

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,

     Respondent.
_____

SIERRA CLUB, DINÉ CARE, DINÉ
FOR THE C-AQUIFER, and SAN JUAN
CITIZENS ALLIANCE,

     Intervenors.

_____

SIERRA CLUB, DINÉ CARE, DINÉ
FOR THE C-AQUIFER, and SAN JUAN
CITIZENS ALLIANCE,

     Petitioners,

v.                                                                      No. 07-9547

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,

     Respondent.

_____

ARIZONA PUBLIC SERVICE
COMPANY,

 Intevenor.

---

**On Petitions For Review of a Final Action of the
United States Environmental Protection Agency**

---

*07-9546:*

Thomas Sayre Llewellyn of Washington, D.C., for Petitioner Arizona Public
Service Company.

David A. Carson (Ronald J. Tenpas, Assistant Attorney General; John C. Cruden,
Deputy Assistant Attorney General, with him on the consolidated brief), United
States Department of Justice, Environment and Natural Resources Division,
Denver, Colorado, for Respondent Environmental Protection Agency.

Matt Kenna, Western Environmental Law Center, Durango, Colorado, for
Intervenors Sierra Club, Diné Care, Diné for the C-Aquifer, and San Juan Citizens
Alliance.

*07-9547:*

Matt Kenna, Western Environmental Law Center, Durango, Colorado, for
Petitioners Sierra Club, Diné Care, Diné for the C-Aquifer, and San Juan Citizens
Alliance.

David A. Carson (Ronald J. Tenpas, Assistant Attorney General; John C. Cruden,
Deputy Assistant Attorney General, with him on the consolidated brief), United
States Department of Justice, Environment and Natural Resources Division,
Denver, Colorado, for Respondent Environmental Protection Agency.

Thomas Sayre Llewellyn of Washington, D.C., for Intervenor Arizona Public
Service Company.

Before **MCCONNELL**, **SEYMOUR** and **HOLMES**, Circuit Judges.

**SEYMOUR**, Circuit Judge.

Arizona Public Service Company ("APS"), operator and majority owner of the Four Corners Power Plant ("Plant"), and Sierra Club, Diné CARE, Diné for the C-Aquifer, and San Juan Citizens Alliance (collectively "Environmentalists") challenge a regulation promulgated by the U.S. Environmental Protection Agency ("EPA"). The regulation at issue is known as a source-specific, federal implementation plan ("federal plan") and was enacted pursuant to sections 301(a) and (d)(4) of the Clean Air Act, 42 U.S.C. §§ 7601(a) and (d)(4). The federal plan limits particular air emissions from the Plant. We have jurisdiction pursuant to section 307(b)(1) of the Act, 42 U.S.C. § 7607(b)(1). Because all parties agree that the federal plan provision pertaining to fugitive dust should be remanded, *see infra* Part II, we do not address this emissions limit in our discussion of the facts. We grant the EPA's motion for voluntary remand and grant in part and deny in part the petitions for review.

**I.**

The purpose of the Clean Air Act is to control and improve the nation's air quality through a combination of state and federal regulation. The Clean Air Act charges the EPA with implementing and overseeing national ambient air quality

standards ("national air standards") for air pollutants that "cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7408(a)(1)(A); *see id.* § 7409.

The Plant, a coal-fired power facility located on the Navajo reservation in northwest New Mexico, emits regulated or "criteria" pollutants. These criteria pollutants include sulfur dioxide ("$SO_2$"), particulate matter ("PM"), and nitrogen oxides ("$NO_x$"). To control emissions of these pollutants, the Plant's five steam generating units employ air pollution control equipment. The Plant also uses federally-mandated continuous opacity monitoring systems ("COMS"), which monitor the opacity levels of emissions. Opacity, *i.e.*, the opaqueness or cloudiness of emissions, is not a criteria pollutant but, according to the EPA, can indicate whether pollution control equipment is properly functioning and whether an emissions limit is being maintained. Data shows that air quality in the area of the Plant is better than the national air standards.

Under section 110 of the Act, states must enact state implementation plans ("state plan") "as may be necessary or appropriate to meet the applicable" national air standards, subject to EPA approval. 42 U.S.C. § 7410(a)(2)(A). State plans approved by the EPA are federally enforceable. If a state fails to submit an adequate plan within the applicable time frame, the EPA must promulgate a federal plan for the state within two years of the failure. The EPA had previously approved New Mexico's state plan, which limits emissions of criteria pollutants

-4-

from coal-burning power plants. The EPA determined the New Mexico plan does not apply to the Plant because of its location on Navajo land. The Plant nonetheless has complied, continuously and voluntarily, with the New Mexico plan. The New Mexico plan does not limit opacity and exempts excess emissions during startup, shutdown, and malfunction.

Section 301(d) of the Act addresses the role of Native-American tribes and authorizes the EPA to "specify[] those provisions of [the Act] for which it is appropriate to treat Indian tribes as States." 42 U.S.C. § 7601(d)(2). Where the EPA "determines that the treatment of Indian tribes as . . . States is inappropriate or administratively infeasible, the [EPA] may provide, by regulation, other means by which the [EPA] will directly administer such provisions so as to achieve the appropriate purpose." *Id.* § 7604(d)(4). In 1998, the EPA adopted what is known as the tribal authority rule ("TAR") to implement its section 301 authority under the Act. The TAR treats tribes as states for most provisions of the Clean Air Act and implementing regulations. The TAR does not treat tribes as states, however, for the mandatory plan submission deadlines, funding restrictions, and related federal oversight mechanisms triggered by a state's failure to submit an adequate plan. Tribes may choose, but are not required, to adopt tribal implementation plans ("tribal plan") for their reservations. Because tribes are not required to adopt tribal plans, the TAR authorizes the EPA to promulgate federal plans to fill any regulatory gaps. The TAR provides that the EPA, pursuant to its explicit

-5-

"discretionary authority" under sections 301(a) and (d)(4) of the Act,

> [s]hall promulgate without unreasonable delay such Federal implementation plan provisions as are necessary or appropriate to protect air quality, consistent with the provisions of sections 304(a)[1] and 301(d)(4), if a tribe does not submit a tribal implementation plan meeting the completeness criteria of 40 CFR part 51, Appendix V, or does not receive EPA approval of a submitted tribal implementation plan.

40 C.F.R. § 49.11(a).

Here, the Navajo Nation did not submit a tribal plan, and the Plant's emissions remained officially unregulated, although the Plant voluntarily complied with the New Mexico plan. To remedy the regulatory gap, the EPA proposed a source-specific federal plan for the Plant. The EPA initially consulted with the Navajo Nation, APS, and the State of New Mexico. The EPA planned to adopt a federal plan that essentially would federalize the requirements of the New Mexico plan historically followed by the Plant and, in some instances, modify the state plan to ensure comprehensive emissions control and federal consistency. The EPA published the proposed federal plan in 1999 and solicited public comment.

In 2006, the EPA published a revised proposed plan and again solicited public comment. The EPA believed regional air quality would "be positively impacted" by the proposed action, as the proposal was "more stringent than, or at

---

[1] Section 49.11(a) mistakenly refers to section 304(a), instead of 301(a).

-6-

least as stringent as, the emissions limitations with which [the Plant] ha[d] historically complied." Source-Specific Federal Implementation Plan for Four Corners Plant; Navajo Nation, 71 Fed. Reg. 53,631, at 53,631 (Sept. 12, 2006) (to be codified at 40 C.F.R. pt. 49). The proposal limited the Plant's emissions of particular criteria pollutants and, relevant to the instant matter, included a 20% opacity limit for two of the Plant's steam generating units, Units 4 and 5. The opacity limit allowed "for one six-minute period per hour of not more than 27 percent opacity, excluding water vapor." *Id.* at 53,633. The opacity and other emissions limits generally did not apply during startup, shutdown, or saturated stack conditions, but did apply during periods of malfunction. The proposal gave APS a limited affirmative defense to claims for penalties brought for excess emissions caused by malfunctions.

APS filed comments on the proposed federal plan, two of which are relevant. First, APS commented that the Plant's emissions during malfunctions should be exempt rather than subject to an affirmative defense. APS argued the law does not require limiting emissions during malfunctions, particularly when no specific justification for the limits existed. APS claimed the definition of malfunction was unfair and irrational, and the affirmative defense improperly shifted the burden of proof. Second, APS objected to the 20% opacity limit as written. It claimed the limit was not achievable, even during periods of best operating practices and proper equipment operation. Based on APS's statistical

analysis of data from its monitoring systems, APS contended the opacity limit had to include a .2% allowance for "periodic exceedances." J.A. at 292. The Plant, APS asserted, could meet the proposed limit only 99.8% of the time. APS noted the EPA had approved an exceedance of up to .8% in a revision to a North Carolina state plan. APS added, "[t]here is no air quality analysis establishing that [] a [20% opacity] limit is necessary to attainment and maintenance of any air quality standard, nor is there any other legal basis for such a requirement." *Id.*

The Environmentalists also commented on the proposal. They contended, *inter alia*, that the proposed federal plan must satisfy the state plan completeness criteria. The proposal was "unacceptable" because the EPA did not justify its chosen emissions limits with "state-of-the-art dispersion modeling to guarantee, at a minimum, the maintenance and attainment of national and state ambient air quality standards and the prevention of significant deterioration increments." *Id.* at 201-02. According to the Environmentalists, the EPA could not rely on the New Mexico plan alone in formulating a new federal plan for the Plant. More stringent emissions limits were required.

The EPA promulgated the finalized federal plan in May 2007. The plan limits the Plant's emissions of specific criteria pollutants, as well as opacity. The EPA's basis for the plan is: (i) to make federally enforceable the emissions limits the Plant has historically followed, (ii) to ensure the Plant continues to reduce its emissions of criteria pollutants, (iii) to guarantee continued maintenance of air

quality standards and protection of visibility in the area, and (iv) to maintain consistent standards between the Navajo Nation and its neighboring states. Opacity for Units 4 and 5 is limited to 20%, averaged over any six-minute period, excluding uncombined water droplets and one six-minute period per hour of not more than 27% opacity. However, if pollution control equipment is operating normally and not fully closed and a high opacity reading occurs, the EPA presumes saturated stack conditions caused the occurrence and will not consider it a violation. Although the EPA did not explicitly address APS's .2% requested allowance, it did explain that "[o]pacity limits are generally applied to ensure a source is meeting its [criteria pollutant] emissions limit." Source-Specific Federal Implementation Plan for Four Corners Power Plant; Navajo Nation, 72 Fed. Reg. 25,698, at 25,701 (May 7, 2007) (to be codified at 40 C.F.R. pt. 49). The EPA added, "The opacity limit for this facility is set to assure proper operation of [pollution control equipment]." *Id.* As in the 2006 proposal, the emissions limits generally do not apply during startup, shut down, or saturated stack conditions, but do apply during periods of malfunction.[2] The EPA contends its treatment of malfunction events is consistent with its "longstanding position,

---

[2] "Malfunction means any sudden and unavoidable failure of air pollution control equipment or process equipment or of a process to operate in a normal or usual manner. Failures that are caused entirely or in part by poor maintenance, careless operation, or any other preventable upset condition or preventable equipment breakdown shall not be considered malfunctions." *Id.* at 25,705.

as reflected in numerous policy documents and rulemakings." *Id.* at 25,702. The plan also includes the affirmative defense to claims for penalties brought for excess emissions caused by malfunctions.

In these consolidated appeals, APS contends that the federal plan is overly restrictive, and the Environmentalists contend it is not sufficiently stringent. APS argues the plan is arbitrary and capricious because, among other things, the EPA did not explain why it chose the particular opacity limit that it did. According to APS, the Plant cannot meet the 20% opacity limit with its existing pollution control equipment, and the EPA has identified no exigency or logical reason to justify its rejection of APS's proposed modifications to the limit. The Environmentalists argue, by contrast, that the plan is arbitrary and capricious because the EPA did not conduct modeling and air quality analysis as required by the Clean Air Act. The Environmentalists want the EPA to enact a new plan on remand that places greater restrictions on the pollution emitted by the Plant.[3]

## II.

Before turning to the parties' arguments, we first address the EPA's motion for voluntary remand of the fugitive dust limit, 40 C.F.R. § 49.23(d)(3). The EPA and APS ask us to remand and vacate this provision, which does not affect the

---

[3] APS questions our jurisdiction over the Environmentalists' challenge because of the wording of the relief they requested. We reject this argument: the Environmentalists' challenge necessarily includes a remand request for reconsideration of the rulemaking, which is within our jurisdiction.

validity of the remainder of the federal plan, because the EPA did not adequately explain its rationale for imposing the limit. The Environmentalists appear to support remand and do not appear to oppose vacation of the provision. They ask only that we order the EPA to reconsider the fugitive dust limit "within a time certain" following remand. Environmentalists' Response to EPA's Motion for Voluntary Remand at 3.

We may partially set aside a regulation if the invalid portion is severable. A regulation is severable if the severed parts "operate entirely independently of one another," and the circumstances indicate the agency would have adopted the regulation even without the faulty provision. *Davis County Solid Waste Mgmt. v. EPA*, 108 F.3d 1454, 1459 (D.C. Cir. 1997). Here, the fugitive dust limit and the remaining provisions of the plan operate independently of one another; the functionality of the plan does not depend on enforcement of the fugitive dust limit. The plan went into effect on November 13, 2008, but enforcement of the fugitive dust limit has been stayed pending our decision. That the EPA requested voluntary remand of the limit, as well as implemented the stay, suggests the agency would have promulgated the plan even without the limit. We conclude the fugitive dust limit is severable and should be remanded and vacated, as no party opposes the narrow scope of this remedy.

We decline to set a time limit on the EPA's course of action on remand. The Environmentalists point to no authority permitting entry of such an order, and

we cannot ignore the general principle that "[t]he function of the reviewing court ends when an error of law is laid bare." *Fed. Power Comm'n v. Idaho Power Co.*, 344 U.S. 17, 20 (1952). To the extent concern exists about the EPA's diligence on remand, mandamus may afford a remedy for undue delay. *See Natural Res. Def. Council v. EPA*, 489 F.3d 1364, 1375 (D.C. Cir. 2007); *see* 5 U.S.C. § 706(1) ("The reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed . . . .").

## III.

Our review of the federal plan is governed by the Administrative Procedure Act, 5 U.S.C. § 706.[4] We will not set aside agency action unless it is "procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute." *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001); *see Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994).

---

[4] APS claims we should review the federal plan under section 307(d)(9) of the Clean Air Act, 42 U.S.C. § 7607(d)(9). APS is incorrect. Section 307(d) applies only to certain EPA rulemakings, and does not include the EPA's promulgation of the plan here. *See* 42 U.S.C. § 7607(d) (listing the promulgations to which section 307(d) applies); *see also Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 497 n.18 (2004); *Am. Forest & Paper Ass'n Inc. v. EPA*, 294 F.3d 113, 116 n.3 (D.C. Cir. 2002). This is not a case, moreover, where the EPA has determined section 307(d) applies. *Cf. North Carolina v. EPA*, 531 F.3d 896, 906 (D.C. Cir. 2008) (reviewing the EPA's action under the Clean Air Act instead of the Administrative Procedure Act, because the EPA specified section 307(d) applied to "all components" of its rulemaking). In any event, APS concedes the two standards are "essentially the same." Aplt. Br. at 23.

Under the arbitrary or capricious standard, we must determine whether the agency considered the relevant data and rationally explained its decision. *Olenhouse*, 42 F.3d at 1574. Agency action is arbitrary or capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut.*, 463 U.S. 29, 43 (1983). While our inquiry into the basis of the agency's action is "searching and careful, our review is ultimately a narrow one." *Maier v. EPA*, 114 F.3d 1032, 1039 (10th Cir. 1997). We will not set aside agency action on account of a less-than-ideal explanation as long as the agency's decisionmaking process may reasonably be discerned. *Alaska Dep't of Envtl. Conservation*, 540 U.S. at 497.

We review the EPA's interpretation of the Clean Air Act, a statute it administers, under the standard set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). "If the statute is clear, we apply its plain meaning" and the inquiry ends. *Qwest Corp. v. FCC*, 258 F.3d 1191, 1199 (10th Cir. 2001) (citing *Chevron*, 467 U.S. at 843). If the statute is silent or ambiguous about the question at issue, as here, we defer to the authorized agency and "apply the agency's construction so long as it is a reasonable interpretation of the statute." *Id.* (citing *Chevron*, 467 U.S. at 843-44).

-13-

An agency is entitled to *substantial* deference when it acts pursuant to an interpretation of its own regulation. *Culbertson v. U.S. Dep't of Agric.*, 69 F.3d 465, 467 (10th Cir. 1995); *see Gonzales v. Oregon*, 546 U.S. 243, 255 (2006) ("An administrative rule may receive substantial deference if it interprets the issuing agency's own ambiguous regulation."). The agency's interpretation is "controlling unless plainly erroneous or inconsistent with the regulation." *Gonzales*, 546 U.S. at 256 (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997)); *see Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (applying "plainly erroneous or inconsistent with the regulation" standard); *Bowles v. Seminole Rock & Sand* Co., 325 U.S. 410, 414 (1945) (same); *Excel Corp. v. U.S. Dep't of Agric.*, 397 F.3d 1285, 1295 (10th Cir. 2005) (same).[5]

Congress delegated to the EPA the authority to promulgate regulations as

---

[5] We note some of our decisions apply a slightly different standard, asking whether the agency's interpretation is "*unreasonable*, plainly erroneous, or inconsistent with the regulation's plain meaning." *See, e.g.*, *Via Christi Reg. Med. Ctr., Inc. v. Leavitt*, 509 F.3d 1259, 1272-73 (10th Cir. 2007) (emphasis added); *Utah Envtl. Congress v. Richmond*, 483 F.3d 1127, 1134 (10th Cir. 2007); *Utah Envtl. Congress v. Bosworth*, 443 F.3d 732, 739 (10th Cir. 2006). It appears this standard is a combination of the plainly erroneous and reasonableness inquiries. *See Bar MK Ranches v. Yuetter*, 994 F.2d 735, 738 (10th Cir. 1993) (citing *Downtown Med. Ctr. v. Bowen*, 944 F.2d 756, 768 (10th Cir. 1991) ("Such an administrative interpretation is ordinarily entitled to considerable deference unless it is plainly inconsistent with the clear meaning of the statute and regulations or unreasonable."). The "reasonableness" standard is applicable to an agency's interpretation of a statute. *See Chevron*, 467 U.S. at 843-44. Here, we apply the more concise "plainly erroneous or inconsistent with the regulation" standard in light of the Supreme Court's pronouncement in *Gonzales*.

-14-

necessary to carry out the objectives of the Clean Air Act. *See* 42 U.S.C. §

7601(a). Congress also granted the EPA discretion to treat Native American

tribes as states and provide, by regulation, other means of protecting air quality in

the absence of approved tribal plans. *Id.* § 7601(d). The EPA exercised this

authority in promulgating the TAR, which led to the source-specific federal plan

at issue. Thus, the EPA's actions are entitled to *Chevron* deference, and the

EPA's interpretation of the TAR, its own regulation, is controlling unless plainly

erroneous or inconsistent with the plain meaning of the regulation.

The EPA argues we should affirm the federal plan. The TAR, the EPA

asserts, allows a federal plan to be a codification of a previously-approved state

plan. Contrary to the Environmentalists, the EPA interprets the TAR as

permitting the agency to take limited action to fill a regulatory gap without

having to conduct extensive, area-wide modeling and analysis. The EPA also

maintains that it provided a reasoned explanation for its decision to apply the 20%

opacity limit to Units 4 and 5. The opacity limit ensures that pollution control

equipment is properly functioning and that the Units continuously comply with

emissions limits. The EPA further claims it reasonably rejected APS's

recommendations for a .2% allowance and exemption for malfunction

exceedances.

We address first the EPA's gap-filling authority under the Clean Air Act

and TAR. We then turn to the 20% opacity limit and the EPA's rejection of

APS's proposed modifications.

**A.**

The underlying theme in the Environmentalists' challenge is that the federal plan is unlawful because it fails to improve sufficiently the air quality in the area surrounding the Plant. The Environmentalists note the Clean Air Act requires the EPA "to protect public health and welfare from any actual or potential adverse effect which in the [EPA]'s judgment may reasonably be anticipate[d] to occur from air pollution . . ., notwithstanding attainment and maintenance of all [national air standards]," 42 U.S.C. § 7470. The Environmentalists argue the "whole point" of an implementation plan is to analyze air quality problems, identify their sources, and minimize those problems. According to the Environmentalists, (i) the TAR's preamble, (ii) its plain language and use of the conjunctive phrase "necessary or appropriate," and (iii) a similar provision of the Clean Air Act regarding state plans make clear that the TAR does not allow the EPA simply to codify the status quo with no new assessment of air quality. They also contend that because almost all of the substantive requirements of state plans apply to tribal plans, any gap-filling federal plan must also have the "same substantive requirements applicable to [state plans], which require monitoring, modeling and air quality assessments necessary to determine the emissions limitations needed to protect regional air quality." Reply Br. at 2.

-16-

At bottom, the Environmentalists argue the TAR *requires* the EPA to implement a more stringent federal plan in order to address adequately all of the current air problems in the area of the Plant. Accordingly, they assert, the EPA must satisfy the same criteria, *i.e.*, conduct the same modeling and analysis, as required for states and tribes. The EPA's only discretion is in choosing the measures to protect air quality. Because the EPA failed to address the area's air problems and did not examine the relevant data or articulate a rational basis for its decision, the federal plan is arbitrary and capricious and fails to comply with the TAR.

We disagree. The TAR treats tribes as states for most provisions of the Clean Air Act and implementing regulations. *See* 40 C.F.R. § 49.3. But it does not treat tribes as states for the mandatory plan submission deadlines, funding restrictions, and related federal oversight mechanisms triggered by a state's failure to submit an adequate plan. *See* 40 C.F.R. § 49.4(a), (d) and (q). Tribes may choose, but are not required, to adopt plans for their reservations. The TAR provides that the EPA, pursuant to its explicit "discretionary authority" under sections 301(a) and (d)(4) of the Clean Air Act,[6]

---

[6] Section 301(a)(1) of the Clean Air Act, 42 U.S.C. § 7601(a)(1), authorizes the EPA to prescribe such regulations as are necessary to carry out the Act, and section 301(d)(4), 42 U.S.C. § 7601(d)(4), authorizes the EPA to administer directly the Act's provisions for which the agency has determined it is inappropriate or infeasible to treat tribes as states.

[s]hall promulgate without unreasonable delay such Federal implementation plan provisions as are necessary or appropriate to protect air quality, consistent with the provisions of sections 304(a) and 301(d)(4), if a tribe does not submit a tribal implementation plan meeting the completeness criteria of 40 CFR part 51, Appendix V,[7] or does not receive EPA approval of a submitted tribal implementation plan.

40 C.F.R. § 49.11(a).

This language does not impose upon the EPA the duty the Environmentalists propose. It provides the EPA discretion to determine what rulemaking is necessary or appropriate to protect air quality and requires the EPA to promulgate such rulemaking. Nothing in section 49.11(a) requires the EPA – as opposed to a tribe – to submit a plan meeting the completeness criteria of Appendix V. Similarly, section 49.11(a) does not prevent the EPA from relying, at it has here, on current air quality monitoring data which shows the region is well within national air standards.

The Environmentalists' construction is contrary to the plain language of section 49.11(a). Their construction would prevent the EPA from implementing any plan "as necessary or appropriate" to protect air quality, absent a comprehensive analysis of all air quality problems in an area. Moreover, such a

_____

[7] Appendix V requires, *inter alia*, that state plans submitted to the EPA include "[m]odeling information required to support the proposed revision, including input data, output data, models used, justification of model selections, ambient monitoring data used, meteorological data used, . . . assumptions, and other information relevant to the determination of adequacy of the modeling analysis." 40 C.F.R. pt. 51, app. V.

construction would conflict with the Act's definition of a federal plan: "The term 'Federal implementation plan' means a plan (or portion thereof) promulgated by the [EPA] to fill all or a portion of a gap or otherwise correct all or a portion of an inadequacy in a State implementation plan, and which includes enforceable emission limitations or other control measures, . . . and provides for attainment of the relevant national ambient air quality standard." 42 U.S.C. § 7602(y). In this instance, some regulation of the Plant is better than none at all.[8]

That another section of the Act requires *states* to regulate emissions "as may be necessary or appropriate" to meet national air standards does not negate the EPA's explicit intent in promulgating the TAR. 42 U.S.C. § 7410(a). As stated in the preamble of the TAR, the EPA recognizes that, as compared to states, tribes are generally in the early stages of developing air planning expertise and need sufficient time to develop air quality programs. The EPA's strategy for implementing the Clean Air Act on Native American reservations is a "multi-pronged approach." 63 Fed. Reg. at 7,264. In some cases the EPA takes a "grass-roots" approach and works with tribes to assess air quality problems and to develop "either tribal or federal strategies for addressing the problems." *Id.* In other cases, the EPA gap-fills by adopting "an average" federal plan based on

---

[8] In fact, the Navajo Nation advised the EPA that "it continues to support EPA's efforts to impose such controls on [the Plant] as are necessary to ensure continued compliance with the substantive requirements of the New Mexico [state plan] . . . ." 64 Fed. Reg. at 48,732-33.

existing state plan rules.[9]  *Id.*  The preamble emphasizes that federal plans "will be analogous to, but not the same in all respects, as the types of rules generally approved into [state plans].  For example, EPA's [federal plans] are likely to represent *an average program*, potentially more stringent than some [state plan] rules and less stringent than others."  *Id.* at 7,263-64 (emphasis added).  The EPA hoped "any additional regulations c[ould] be promulgated and implemented relatively quickly" under the "very broad statutory authority" granted by the Act. *Id.* at 7,263.  The EPA did not intend to self-impose a duty to implement *all* measures otherwise required for states and tribes.

In sum, the key criterion in determining the adequacy of any plan is attainment and maintenance of the national air standards.  *See* 42 U.S.C. §§ 7410(a) and 7602(y); *see also Union Elec. Co. v. EPA*, 427 U.S. 246, 265 (1976) ("States may submit implementation plans more stringent than federal law requires and [] the [EPA] must approve such plans if they meet the minimum [Clean Air Act] requirements of § 110(a)(2)."); *Train v. Natural Res. Def. Council*, 421 U.S. 60, 79 (1975) (explaining that EPA's primary responsibility in

---

[9] An earlier proposed version of the TAR includes a similar edict: "Today's action also does not require Tribes to develop [Clean Air Act] programs *wholly from scratch*.  For example, a Tribe may adopt or incorporate standards from an adjacent or similarly situated State, with appropriate revisions that would adapt the State standards to reservation conditions or Tribal policies."  Indian Tribes: Air Quality Planning and Management, 59 Fed. Reg. 43,956, at 43,961 (Aug. 25, 1994) (to be codified at 40 C.F.R. pts. 35, 49, 50, and 81) (emphasis added).

approving plans is to determine whether "the ultimate effect of a State's choice of emission limitations is compliance with the national standards for ambient air"). The federal plan at issue codifies in part the New Mexico plan – previously studied, analyzed, approved, and in place – and relies on current data demonstrating that the air quality in the area of the Plant is better than the national air standards for criteria pollutants. Therefore, the EPA had no need to conduct additional modeling and analysis to demonstrate the adequacy of the plan, a fact the EPA already knew. The federal plan, by necessity, is adequate because the plan is but a stricter version of the satisfactory emissions limits already applied by the Plant and implemented throughout the State of New Mexico. Because the EPA's interpretation of its own regulation is not "plainly erroneous or inconsistent with the regulation," we must defer to the EPA. *Gonzales v. Oregon*, 546 U.S. at 256. We conclude the Environmentalists' petition should be denied.

**B.**

The remaining issue is whether the EPA's decision to enact a 20% opacity limit and to reject APS's proposed modifications was arbitrary and capricious. APS claims the EPA did not provide a reasoned basis for the 20% opacity limit, arguing that it did not establish why it chose that particular limit or how this 20% figure ensures compliance with national air standards. APS claims the EPA did not, moreover, adequately explain its use of or basis for the underlying PM

-21-

emissions limit that justifies the opacity limit.[10] APS acknowledges it originally agreed to a 20% opacity limit, albeit with an exemption for periods of malfunction. Nevertheless, APS claims that, without an allowance for periodic exceedances, the opacity limit is unattainable with current control equipment, contrary to APS's statistical analysis of the historical COMS data, and unnecessary to maintain national air standards.

APS further contends the EPA's refusal to exempt excess emissions caused by malfunctions is inconsistent with its position on excess emissions during other periods and is not supported by any analysis showing this policy is necessary for maintenance of the national air standards. It notes the EPA altogether failed to respond to APS's proposed .2% allowance. APS adds that the affirmative defense to civil penalties does not cure the EPA's error and does not preclude a finding of violation or the granting of injunctive relief. Similarly, according to APS, the affirmative defense is not justified by any underlying factual basis.

We note first that APS may not challenge the PM limit as arbitrary or capricious. APS did not contest the rationality of the underlying PM limit during the comment period and, therefore, cannot raise the issue on appeal. *See Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 783 (10th Cir.

---

[10] PM is a criteria pollutant and stands for "particulate matter." *See supra* Part I. PM "refers to all 'solid particles and liquid droplets found in air.'" *Am. Trucking Assoc., Inc. v. EPA*, 283 F.3d 355, 359 (D.C. Cir. 2002).

2006) (refusing to consider argument because, *inter alia*, it was not raised with agency); *Excel Corp.*, 397 F.3d at 1296-97 (deeming arguments waived if record does not show presentation to agency); *N.M. Envtl. Improvement Div. v. Thomas*, 789 F.2d 825, 836 (10th Cir. 1986) ("The court will not entertain arguments which should have properly been made before the agency in the first instance."). APS implicitly defends its failure to challenge the PM limit by noting that it requested notice of, and the opportunity to comment on, any rationale the EPA might ultimately develop for the various emissions limits. We acknowledge the 2006 proposal did not state that the opacity limit ensures compliance with the PM limit. *See* J.A. at 12, 15. However, the EPA did provide this justification in the 1999 proposed plan and in the technical document supporting the 1999 proposal. *See id.* at 3, 54, 153. APS clearly cannot claim it did not have notice of the EPA's basis for the opacity limit. APS knew of the EPA's justification since at least 1999 and likely as early as 1994.[11] Yet APS never challenged the opacity limit by attacking the rationality of the underlying PM limit. *See id.* at 100-01, 171-84, 291-93, 296-300, 304. APS cannot rely on general or vague commentary now to avoid the established principles of waiver. *See Appalachian Power Co. v. EPA*, 251 F.3d 1026, 1036 (D.C. Cir. 2001) ("Generalized objections to agency

---

[11] In a 1994 letter to the EPA, APS stated "since there is no quantifiable relationship between opacity and [PM] emissions or ambient concentrations of [PM], an opacity requirement is not necessary for [national air standards] attainment purposes." J.A. at 100.

action . . . will not do. An objection must be made with sufficient specificity reasonably to alert the agency.") (internal quotations omitted). Thus, APS has waived any challenge to the PM limit.

APS's remaining arguments lack merit. The EPA provided a reasoned basis for the 20% opacity limit. As the EPA has repeatedly explained, the opacity limit is necessary to ensure Units 4 and 5 are in continuous compliance with the PM limit and are properly operated and maintained. *See* J.A. at 3, 22. APS must perform annual testing to ensure direct compliance with the PM limit. 40 C.F.R. § 49.23(e). The opacity limit helps to make certain that the Units continuously comply with the PM limit during the periods between annual tests.

The EPA did not need to explain or demonstrate why it selected 20% as the opacity limit. APS initially agreed to the 20% figure, fully understood the EPA's justification for the limit, and never suggested that another number was necessary. Prior to 2006, APS never claimed it could not achieve the 20% limit, except during startup, shutdown, malfunction, and saturated stack conditions. *See* J.A. at 110, 127, 130, 174-76, 291-93, 297-300. In fact, in 1996, APS informed the EPA that normal opacity levels "typically [were] less than 5 percent." *Id.* at 115.

Moreover, the opacity limit is not counter to any evidence in the record. APS did not submit data or analysis to support its .2% proposal, although it claimed to have such documentation. APS waited twelve years before even

-24-

mentioning the matter.[12] APS did not explain then – and does not elucidate now – what actually *caused* the exceedances allegedly recorded in the withheld COMS data.[13] We agree with our sister circuit that an agency must respond only to relevant comments, which "cast doubt on the reasonableness of a position taken by the agency." *Nat'l Mining Assoc. v. Mine Safety & Health Admin.*, 116 F.3d 520, 549 (D.C. Cir. 1997) (internal quotation marks omitted); *see Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993) ("We reiterate that to require response by the agency, comments must do more than simply state that the agency's premises or conclusions are wrong; they must explain why and on what basis the agency assertedly has erred."); *see also Kennecott Copper Corp. v. EPA*, 612 F.2d 1232, 1236 (10th Cir. 1979) ("[A]gencies need not supply comprehensive explanations and record citations for each and every conclusion.

_____

[12] APS appears to justify this delay by explaining, "By the time EPA published the 2006 proposed [federal plan], APS noticed that in other contexts, EPA appeared to be willing to deal reasonably with the issue of excess opacity emissions. APS had also come to recognize that the definition of malfunction would not always be easy to apply." Reply at 23. These justifications do not suffice. The EPA's treatment of opacity in separate rulemakings, with completely distinguishable facts and law, has nothing to do with the reasonableness of the opacity limit at hand. Similarly, APS knew of the malfunction definition since at least 1994, *see* J.A. at 87, and yet did not seek the additional allowance until 2006.

[13] Moreover, we know now that APS was not completely candid in requesting the .2% allowance. APS admits the .2% figure "include[s] a margin of safety so that if adopted, [the Plant] could be reasonably certain of full compliance." Aplt. Br. at 19 n.6. APS has yet to explain the percentage of or basis for the margin of error surreptitiously added to arrive at the .2% figure.

These rules are to ensure satisfaction of due process requirements and meaningful public participation in rulemaking, not to straitjacket agency proceedings." (citation omitted)).

While we agree the EPA did not address explicitly APS's request for a .2% allowance, we note the EPA did address the substance of APS's proposal. Only five logical explanations exist for periodic exceedances: saturated stack conditions, startup, shutdown, unavoidable malfunctions, and operator error or neglect. The federal plan addresses each of these possibilities. Regarding saturated stack conditions, the federal plan provides that "[i]f the [pollution control equipment] is operating within its normal operating parameters . . . [and] not fully closed, and a high opacity reading occurs, it will be presumed that the occurrence was caused by saturated stack conditions and shall not be considered a violation." 40 C.F.R. § 49.23(e). Regarding startup and shutdown, "the otherwise applicable emission limits . . . for opacity and [PM] shall not apply" provided that the Plant (i) operates to minimize emissions and uses best efforts to meet the otherwise applicable emission limit, (ii) minimizes to the extent practicable the frequency and duration of startups and shutdowns, and (iii) properly documents startups and shutdowns. *Id.* § 49.23(h)(2). Regarding unavoidable malfunction events, the federal plan states that "[e]missions in excess of the level of the applicable emission limit . . . that occur due to a malfunction shall constitute a violation of the applicable emission limit." *Id.* § 49.23(h)(3).

-26-

APS has an affirmative defense to claims for penalties if it can show, *inter alia*, that a malfunction resulted from a sudden and unavoidable failure of process or equipment. *Id.* The plan does not excuse excess emissions resulting from operator error or neglect. *Id.* § 49.23(h)(3)(ii). That APS does not agree with the EPA's rejection of the substance of its proposed .2% allowance is irrelevant; as long as the EPA's decisionmaking process may reasonably be discerned, we will not set aside the federal plan on account of a less-than-ideal explanation. *Alaska Dep't of Envtl. Conservation*, 540 U.S. at 497.

Nor are we persuaded by APS's disagreement with the EPA's rejection of its proposed malfunction exemption. As the EPA explained during the rulemaking process, its treatment of excess emissions resulting from malfunctions is consistent with longstanding EPA policy set forth in various memoranda in the record. The longstanding policy makes clear that excess emissions resulting from malfunctions are violations of the Clean Air Act, for such emissions can interfere with attainment of the national air standards. *See* 72 Fed. Reg. at 25,702, 25,705; State Implementation Plans: Policy Regarding Excessive Emissions During Malfunctions, Startup, and Shutdown (Sept. 20, 1999) (hereinafter *Herman Memorandum*); Policy on Excess Emissions During Startup, Shutdown, Maintenance, and Malfunctions (Feb. 15, 1983) (hereinafter *Bennett Memorandum*). The longstanding policy grants a limited affirmative defense where interference with national air standards will not occur and injunctive relief

-27-

is still available as an enforcement mechanism.

Contrary to APS's assertion, the EPA's treatment of malfunction events is not inconsistent with its treatment of startup and shutdown episodes. The EPA's longstanding policy applies "alternate limits" to excess emissions resulting from these infrequent, reasonably foreseeable episodes, where a source's pollution control equipment is technically incapable of meeting the emissions limits for a defined period of time. 72 Fed. Reg. at 25,702; Herman Memorandum at 3, attach. at 4-5; Bennett Memorandum at 17-5. The EPA has reiterated that bypassing the pollution control equipment during startup and shutdown episodes may be necessary to avoid "loss of life, personal injury, or severe property damage." Bennett Memorandum at 17-5; *see* Herman Memorandum at 3 (recognizing that for some sources even the best available pollution control equipment cannot be effective during every startup and shutdown). We defer to the EPA's longstanding policy, for the policy is a reasonable interpretation of the Clean Air Act.

We acknowledge APS is correct that exemption of the Plant's excess emissions from malfunction events logically would not lead to interference with attainment of the national air standards. Neither the New Mexico state plan nor the Plant's historical operations deem excess emissions from malfunctions as violations. APS's point carries no weight, however. The EPA's longstanding policy explicitly states that a limited affirmative defense to penalties for

malfunctions may be available where interference with the national air standards will not occur.  Thus, the EPA interprets the Act as allowing a limited affirmative defense only in situations where attainment will not be detrimentally affected, and this is exactly what the federal plan provides.  Moreover, in response to APS's argument that the policy justification lacks a "limiting standard against which to measure [] reasonableness," Reply Br. at 22, we note there is no requirement that a gap-filling federal plan can be only as strict as necessary to meet national air standards.  The Clean Air Act and the TAR certainly do not include such a mandate.  States, and presumably tribes, may surpass national air standards as long as their plans satisfy all of the minimal Clean Air Act requirements.  *See Union Elec. Co.*, 427 U.S. at 263-65 (holding that the EPA cannot disapprove a state plan solely because it imposes stricter limits than the national air standards or is economically or technologically infeasible).  We have found no authority saying that we can prevent the agency to which we owe substantial deference from implementing the same type of superior plan.

Finally, we reject APS's challenge to the justification for the affirmative defense.  APS argues, without citation to any authority, that the EPA must justify inclusion of the affirmative defense with "a factual basis for presuming that excess emissions are the fault of APS, and requiring APS to prove otherwise." Reply at 28.  We need not address unsupported, conclusory arguments.  *See Pignanelli v. Pueblo Sch. Dist. No. 60*, 540 F.3d 1213, 1217 (10th Cir. 2008)

(deeming argument waived for failure to cite any supporting legal authority or record evidence). APS adds that the EPA offered no defense to this "burden-shifting" affirmative defense. *See* Reply at 27-28. We disagree. The EPA did explain its inclusion of the affirmative defense:

> [E]ach party bears the appropriate burden in any enforcement case. The party seeking to enforce a claim bears that burden of proving that excess emissions occurred to establish a violation. [APS] may raise as a defense to penalties that the violation was unavoidable and [the Plant] took appropriate preventive and corrective action. The court retains its function of determining whether each party has met its burden.

72 Fed. Reg. at 25,702. We hold the EPA has established "an adequate rationale" for the affirmative defense. *National Tank Truck v. EPA*, 907 F.2d 177, 184 (D.C. Cir. 1990). This is all that *Chevron* requires.

We conclude the EPA has not acted arbitrarily or capriciously. The EPA identified a regulatory need and enacted a source-specific federal plan to fill this gap. The EPA has neither relied on factors which Congress did not intend it to consider nor failed to consider any important aspect of the problem. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. The EPA addressed all substantive aspects of APS's comments: startup, shutdown, malfunction, and saturated stack conditions. The EPA based its decision on the evidence before it, *i.e.*, current air quality data for the area surrounding the Plant, and incorporated its negotiations with APS, the Navajo Nation, and the State of New Mexico into its plan. We can ascribe APS's disagreement with the EPA's final action to a difference in view.

-30-

*See id.* Accordingly, APS's petition is denied.

## IV.

For the reasons set forth above, we **GRANT** the motion for voluntary remand and **VACATE** and **REMAND** the federal implementation plan insofar as it pertains to the fugitive dust limit. We **DENY** APS's petition for review, **DENY** the Environmentalists' petition for review, and **AFFIRM** the remainder of the federal implementation plan.