FILED
United States Court of Appeals
Tenth Circuit

August 6, 2012

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

US MAGNESIUM, LLC,

     Petitioner,

v.

UNITED STATES
ENVIRONMENTAL
PROTECTION AGENCY,

     Respondent.

No. 11-9533

## ON PETITION FOR REVIEW OF A FINAL ACTION OF THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
### Ag. No. R08-OAR2010-0909)

Michael A. Zody (Michael J. Tomko and Jacob A. Santini, with him on the briefs), of Parsons Behle & Latimer, Salt Lake City, Utah, for Petitioner.

David A. Carson (Ignacia S. Moreno, Assistant Attorney General, with him on the brief), United States Department of Justice, Environment and Natural Resources Division, Denver, Colorado, for Respondent.

Before **BRISCOE,** Chief Judge, **McKAY** and **HARTZ**, Circuit Judges.

**BRISCOE**, Chief Judge.

US Magnesium seeks review of a recent final rule from the United States

Environmental Protection Agency (EPA). In its rule, the EPA has called for Utah to revise its State Implementation Plan (SIP) for the federal Clean Air Act (CAA). Under the CAA, the EPA may call for a state to revise its SIP (a SIP Call) if the EPA finds the state's current SIP substantially inadequate. Here, the EPA determined that Utah's SIP was substantially inadequate because it contains an Unavoidable Breakdown Rule (UBR), which permits operators of CAA-regulated facilities to avoid enforcement actions when they suffer an unexpected and unavoidable equipment malfunction. In this SIP Call, published as a final rule in April 2011, the EPA requested that Utah promulgate a new UBR—one that conforms with the EPA's interpretation of the CAA. US Magnesium maintains that the SIP Call is arbitrary and capricious and asks this court to vacate it. We have exclusive jurisdiction under CAA § 307(b)(1), 42 U.S.C. § 7607(b)(1), and we deny the petition for review.

# I

## A. CAA framework.

The CAA uses a cooperative-federalism approach to regulate air quality. The EPA promulgates National Ambient Air Quality Standards (NAAQS) for six airborne pollutants, CAA § 109, 42 U.S.C. § 7409, with acceptable pollution levels based on human health and welfare. Areas meeting the NAAQS are termed attainment areas, and areas not meeting the NAAQS are termed nonattainment areas. States create their own SIPs to bring nonattainment areas into compliance

2

with the NAAQS and to prevent deterioration of air quality in attainment areas. CAA §§ 107 & 110, 42 U.S.C. §§ 7407 & 7410. The EPA reviews each SIP and then may approve a SIP through notice-and-comment rulemaking. CAA §§ 110(c) & (k)(3), 42 U.S.C. §§ 7410(c) & (k)(3). Approved SIPs are enforceable as federal law and may be enforced by the state, the EPA, or individuals under the CAA citizen-suit provision. CAA §§ 110(a)(1), 113, 304; 42 U.S.C. §§ 7410(a)(1), 7413, 7604. The EPA directly administers the CAA in states without an approved SIP.

The EPA directly regulates several kinds of air emissions. First, the EPA regulates hazardous air pollutants by establishing National Emission Standards for Hazardous Air Pollutants (NESHAPs), which apply directly to all sources of air pollutants. The NESHAPs are technology-based standards, based on the Maximum Achievable Control Technology (MACT) for each hazardous air pollutant. The EPA also directly regulates new sources of air pollution through technology-based New Source Performance Standards (NSPS). In attainment areas—those areas where air quality meets the NAAQS—the NSPS requires installation of the Best Available Control Technology (BACT). In nonattainment areas, where the air quality does not meet NAAQS, the EPA requires that new sources emit at the Lowest Achievable Emission Rate (LAER). Utah has incorporated these rules into its air-quality standards by reference in order to receive a general delegation of CAA implementation authority for its SIP. See

3

Utah Admin. Code r. 307-210 & r. 307-214.

The EPA may require a state to alter an approved SIP if it finds, through notice-and-comment rulemaking, that the SIP "is substantially inadequate to attain or maintain the relevant [NAAQS] . . . or to otherwise comply with any requirement of [the CAA]." CAA § 110(k)(5), 42 U.S.C. § 7410(k)(5). If the EPA determines that a SIP is substantially inadequate, it calls for revision of the SIP through a SIP Call. CAA §§ 110(a)(2)(H) & (k)(5), 42 U.S.C. §§ 7410(a)(2)(H) & (k)(5). A state's failure to respond to the SIP Call can result in a federal takeover of CAA implementation in the state and the loss of significant federal funds.

*B. Utah SIP.*

The EPA approved Utah's current SIP in 1980. 45 Fed. Reg. 10761, 10763 (Feb. 19, 1980). Utah contains attainment areas, nonattainment areas, and nonattainment areas that have come into compliance with the NAAQS, which are called maintenance areas. As relevant to this litigation, Utah's SIP contains a UBR exemption, Utah Admin. Code r. 307-107-1, which states that "emissions resulting from an unavoidable breakdown will not be deemed a violation of these regulations." The Utah UBR applies to "all regulated pollutants," id., which includes NESHAPs and the pollutants governed by the NAAQS and NSPS.

The UBR requires that

> [t]he owner or operator of an installation suffering an
> unavoidable breakdown shall assure that emission

4

limitations and visible emission limitations are exceeded for only as short a period of time as reasonable. The owner or operator shall take all reasonable measures which may include but are not limited to the immediate curtailment of production, operations, or activities at all installations of the source if necessary to limit the total aggregate emissions from the source to no greater than the aggregate allowable emissions averaged over the periods provided in the source's approval orders or [Utah code]. In the event that production, operations or activities cannot be curtailed so as to so limit the total aggregate emissions without jeopardizing equipment or safety or measures taken would result in even greater excess emissions, the owner or operator of the source shall use the most rapid, reasonable procedure to reduce emissions.

Id. at r. 307-107-4. The UBR further provides that

[a] breakdown for any period longer than 2 hours must be reported to the [Utah] executive secretary . . . . Within 7 calendar days of the beginning of any breakdown of longer than 2 hours, a written report shall be submitted to the executive secretary which shall include the cause and nature of the event, estimated quantity of pollutant (total and excess), time of emissions and steps taken to control the emissions and to prevent recurrence. The submittal of such information shall be used by the executive secretary in determining whether a violation has occurred and/or the need of further enforcement action.

Id. at r. 307-107-2.

### C. Current EPA rulemaking.

The EPA approved Utah's UBR as part of the state's SIP in 1980, albeit with the caveat that exemptions under the UBR "may not be approved by the EPA." 45 Fed. Reg. 10761, 10763 (Feb. 19, 1980). When the EPA approved Utah's UBR, the EPA had not yet developed its own policy on emissions during

equipment malfunctions; it released the first version of its policy in 1982. The EPA updated its policy several times: first in 1983, then in 1999 (the Herman Memorandum), and most recently in 2001 (the Schaeffer Memorandum). The EPA's equipment-malfunction policy sets out its interpretation of the CAA's requirements with respect to malfunctions, but it is only a policy statement, has not undergone notice-and-comment rulemaking, and does not have the force of law. Ariz. Pub. Serv. Co. v. U.S. E.P.A., 562 F.3d 1116, 1130 (10th Cir. 2009). Nevertheless, we approved the EPA's policy statement in Arizona Public Service Co., noting that "[w]e defer to the EPA's longstanding policy, for the policy is a reasonable interpretation of the Clean Air Act." Id.

After the EPA updated its policy in 1999, it asked Utah to address several concerns with the Utah UBR, and Utah's Division of Air Quality (UDAQ) agreed that the UBR would benefit from clarification. Utah proposed an amended rule in 2004, but the EPA notified Utah that the EPA could not approve a SIP that included the proposed amendment. Ultimately, in 2008, the Utah Air Quality Board decided to leave the UBR unchanged. In response, in 2010, the EPA published a notice of proposed rulemaking proposing to find the Utah SIP substantially inadequate due to its continued inclusion of the UBR. Although UDAQ opposed the proposed rule, EPA nevertheless published the SIP Call as a final rule in April 2011, and Utah has since agreed to revise the UBR.

When it promulgated the final rule, the EPA provided three primary

justifications for its finding that the Utah SIP was substantially inadequate. First, the EPA found that the UBR "[d]oes not treat all exceedances of SIP and permit limits as violations," which could preclude injunctive relief. Joint Appendix (JA) at 2. The EPA reasoned that

> [t]his generic exemption, applicable to all Utah SIP limits, precludes any enforcement when there is an unavoidable breakdown. Our interpretation of the CAA is that an exemption from injunctive relief is never appropriate, and that an exemption from penalties is only appropriate in limited circumstances. Contrary to CAA section 302(k)'s definition of emission limitation, the exemption in the UBR renders emission limitations in the Utah SIP less than continuous and, contrary to the requirements of CAA sections 110(a)(2)(A) and (C), undermines the ability to ensure compliance with SIP emissions limitations relied on to achieve the NAAQS and other relevant CAA requirements at all times. Therefore, the UBR renders the Utah SIP substantially inadequate to attain or maintain the NAAQS or to comply with other CAA requirements . . . .

Id. at 3.

Second, the EPA determined that the UBR "could be interpreted to grant the Utah executive secretary exclusive authority to decide whether excess emissions constitute a violation." Id. at 2. The EPA explained:

> This provision appears to give the [Utah UDAQ] executive secretary exclusive authority to determine whether excess emissions constitute a violation and thus to preclude independent enforcement action by EPA and citizens when the executive secretary makes a non-violation determination. This is inconsistent with the enforcement structure under the CAA, which provides enforcement authority not only to the States, but also to EPA and citizens. Because a court could interpret section R307–107–2 as undermining the ability of EPA and

7

citizens to independently exercise enforcement discretion granted by the CAA, it is substantially inadequate to comply with CAA requirements related to enforcement. Because it undermines the envisioned enforcement structure, it also undermines the ability of the State to attain and maintain the NAAQS and to comply with other CAA requirements related to PSD, visibility, NSPS, and NESHAPS. Potential EPA and citizen enforcement provides an important safeguard in the event a State cannot or does not enforce CAA violations and also provides additional incentives for sources to design, operate, and maintain their facilities so as to meet their emission limits. Thus, R307–107–2 renders the SIP substantially inadequate to attain or maintain the NAAQS or otherwise comply with the CAA.

Id. at 3.

Third, the EPA found that the UBR "improperly applies to Federal technology-based standards such as [NSPS and NESHAPS]." Id. at 2. These standards, developed by the EPA, already contain exemptions for breakdowns, and the EPA believes that states should not be able to add additional exemptions. The EPA found that

[the UBR] also applies to Federal technology-based standards like the NSPS and NESHAPS that Utah has incorporated by reference to receive delegation of Federal authority. To the extent any exemptions from these technology-based standards are warranted for malfunctions, the Federal standards contained in EPA's regulations already specify the appropriate exemptions. No additional exemptions (or criteria for deciding whether an applicable exemption applies) are warranted or appropriate. Thus, the Utah SIP is substantially inadequate because [the UBR] improperly provides an exemption and criteria not contained in and not sanctioned by the delegated Federal standards.

8

Id. at 3.

In its rulemaking, the EPA also referred to its longstanding policy on emissions during equipment malfunctions. Under the heading "Why is EPA proposing a SIP Call?" in the proposed rule, the EPA states that the UBR "contains various provisions that are inconsistent with EPA's interpretations [expressed in the longstanding policy] regarding the appropriate treatment of malfunction events in SIPs and which render the Utah SIP substantially inadequate. As a result, we are calling for a SIP revision." Id. at 17. The final rule also cited to the EPA's longstanding policy to explain in more detail the reasoning behind all three of the EPA's primary arguments for the rule. Id. at 4, 5, 7. But despite the numerous citations to its longstanding policy, the EPA does not appear to have relied directly on its longstanding policy to justify its SIP Call. In response to the comment that:

> EPA lacks the regulatory authority to make a SIP Call based on policy or guidance that has not become applicable law. The [Herman Memorandum] EPA cites as justification for the SIP Call has never been subjected to the legal requirements of notice and public rulemaking under the Administrative Procedures Act,

id. at 6, the EPA argued that

> [the Herman Memorandum] reflects our interpretation of the CAA. We have not treated it as binding on the States or asserted that it changed existing SIP provisions. Instead, we have done what commenters argue is necessary—we have engaged in notice and comment rulemaking to determine whether a SIP Call is appropriate in this case. Through this rulemaking action, we have

9

evaluated provisions of the Utah SIP to determine whether they are consistent with our interpretation of the CAA as reflected in our policies. We provided commenters with the opportunity to comment on the proposed SIP Call and our basis for it, and are only finalizing the SIP Call after carefully considering commenters' comments. To the extent some commenters may be arguing that we must conduct national rulemaking on our policy before we can conduct SIP Call rulemaking with respect to a specific State malfunction provision, we find no basis for this assertion in the CAA. We have evaluated the UBR, found it substantially inadequate as specified in the CAA, and issued a SIP Call as required. The process we have followed and the substance of our action are reasonable.

Id. at 6-7.

Finally, the EPA addressed the question of whether it was required to make a specific factual finding to support the SIP Call:

The thrust of several comments is that we have not presented facts or empirical evidence that the UBR is not working or that shows [sic] any measured or modeled impact on attainment or maintenance of a NAAQS due to excess emissions resulting from an unavoidable breakdown. As we indicated in our proposal (see 75 FR 70892), we need not show a direct causal link between any specific unavoidable breakdown excess emissions and violations of the NAAQS to conclude that the SIP is substantially inadequate. It is our interpretation that the fundamental integrity of the CAA's SIP process and structure is undermined if emission limits relied on to meet CAA requirements can be exceeded without potential recourse by any entity granted enforcement authority by the CAA. We are not restricted to issuing SIP Calls only after a violation of the NAAQS has occurred or only where a specific violation can be linked to a specific excess emissions event. It is sufficient that emissions limits to which the unavoidable breakdown exemption applies have been, are being, and will be relied on to attain and maintain the NAAQS and meet other CAA requirements.

10

Id. at 5. Although it maintained that it need not make a factual showing the UBR resulted in NAAQS violations, the EPA nevertheless provided some information about the magnitude of emissions released during malfunctions, which demonstrated that releases during malfunction can be significant, with one plant releasing three times its daily limit of sulphur dioxide over a nine-hour period. These examples show no NAAQS violations resulting from the UBR, but they do not purport to do so; instead, they show the potential magnitude of releases related to breakdowns.

## II

After the EPA promulgated its final rule, US Magnesium timely filed this petition. US Magnesium makes three primary arguments:

1. "EPA's SIP Call is arbitrary and capricious because EPA failed to support its conclusion that the UBR rendered the Utah SIP substantially inadequate with sufficient facts in the administrative record." Pet. Br. at i.

2. "EPA's SIP Call is arbitrary and capricious because EPA relied exclusively on policy statements that have not been adopted through rulemaking procedures." Id.

3. "EPA's SIP Call is arbitrary and capricious because it is inconsistent with its own policy statements and regulations." Id. at iii.

In response, the EPA argues that US Magnesium lacks standing, that the EPA's interpretation of the CAA should be upheld under Chevron deference,

11

Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984), and generally that US Magnesium's arguments lack merit.

*A.  Standard of review.*

The parties agree that our review of the SIP Call is governed by the Administrative Procedure Act (APA), 5 U.S.C. § 706.  Under the APA, "we will not set aside agency action unless it is procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute." Ariz. Pub. Serv. Co., 562 F.3d at 1122 (internal quotation marks and citations omitted).  Agency action is arbitrary or capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Id. at 1122-23 (internal quotation marks and citations omitted).  Our inquiry is "searching and careful, [but] our review is ultimately a narrow one." Maier v. EPA, 114 F.3d 1032, 1039 (10th Cir. 1997).

"We review the EPA's interpretation of the Clean Air Act, a statute it administers, under the standard set forth in Chevron.  If the statute is clear, we apply its plain meaning and the inquiry ends.  If the statute is silent or ambiguous about the question at issue . . . , we defer to the authorized agency and apply the agency's construction so long as it is a reasonable interpretation of the statute."

12

Ariz. Pub. Serv. Co., 562 F.3d at 1122 (internal quotation marks and citations omitted).

## B. *US Magnesium has standing to pursue this petition for review.*

Before addressing whether US Magnesium has standing, we must first determine whether we can consider the declaration of Bryce Bird, Director of UDAQ (Bird Declaration), which US Magnesium attached to its reply brief.[1] Generally, parties petitioning for review of agency decisions may only rely on evidence in the administrative record, but, as we have recognized, "[b]ecause Article III's standing requirement does not apply to agency proceedings, [US Magnesium] had no reason to include facts sufficient to establish standing as a part of the administrative record." Qwest Commc'ns Int'l v. FCC, 240 F.3d 886, 892 (10th Cir. 2001) (citing Nw. Envtl. Def. Ctr. v. Bonneville Power Admin., 117 F.3d 1520, 1527-28 (9th Cir. 1997)). We have not addressed this specific issue, but the Supreme Court seems to anticipate that litigants in a similar position could supplement the record:

> We strongly suggest that in future cases parties litigating in this Court under circumstances [in which the case originated in a court not subject to Article III's requirements] take pains to supplement the record in any manner necessary to enable us to address with as much precision as possible any question of standing that may be raised.

---

[1] The parties have not addressed the issue of supplementing the administrative record in their briefs, although both parties seek to supplement the record.

13

Pennell v. City of San Jose, 485 U.S. 1, 8 (1988); see also Qwest Commc'ns Int'l, 240 F.3d at 892-93.  Further, the Ninth Circuit considered a similar issue in Northwest Environmental Defense Center, and held that "[b]ecause standing was not at issue in earlier proceedings, . . . petitioners in this case were entitled to establish standing anytime during the briefing phase.  We consider the affidavits solely to determine whether petitioners have standing to bring this action."  117 F.3d at 1528.  Finally, the United States Code section giving us original jurisdiction in this matter seems to anticipate that the reviewing court may allow additional evidence in some circumstances, although it does not directly address this situation.  CAA § 307(c), 42 U.S.C. § 7607(c) (discussing when a court may allow the EPA administrator to consider additional evidence already admitted by the court).  Based on the Supreme Court's statement, as well as the persuasive decision by the Ninth Circuit and the legislative suggestion that additional evidence is admissible in these cases, we accept the Bird Declaration for the sole purpose of determining whether US Magnesium has standing to bring this challenge.

> A party has standing to pursue a claim in federal court only if: (1) it suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) that injury is fairly traceable to the challenged action of the defendant rather than some third party not before the court; and (3) that injury is likely to be redressed by a favorable decision.

14

Hydro Res., Inc. v. U.S. E.P.A., 608 F.3d 1131, 1144 (10th Cir. 2010) (citing

Lujan v. Defenders of Wildlife, 504 U.S. 550, 560-61 (1992)) (internal quotations

marks omitted).[2]  US Magnesium owns a facility regulated under the Utah SIP and

states that it has relied on the UBR to avoid regulatory liability in the past, such

that a revised SIP, as required by the SIP Call, would not provide it with the same

protection from liability that it currently enjoys.  Thus, US Magnesium meets the

injury-in-fact and causation prongs of the standing inquiry.  But the EPA

challenges the redressability prong, arguing that Utah is an independent actor, not

a party to this action, and that US Magnesium failed to show that "Utah will

abandon its revision of the [UBR] if US Magnesium were to prevail on the merits

here."  Res. Br. at 22.

---

[2]  We note that the EPA has issued the SIP Call as a final rule in this case, rendering inapposite those cases holding that a SIP Call absent a final rule is not ripe for challenge.  Compare Greater Cincinnati Chamber of Commerce v. U.S. E.P.A., 879 F.2d 1379, 1381 (6th Cir. 1989) (holding that the EPA's SIP Call, which consisted of informing the state's Governor and publishing a notice in the federal register, had no regulatory effect, making the issue unripe), Illinois v. U.S. E.P.A., 621 F.2d 259, 261 (7th Cir. 1980) (holding that a "notice of deficiency issued by [the EPA] to state of Illinois with respect to a state plan for implementation, maintenance and enforcement of air quality standards . . . did not have a sufficient impact on parties to give rise to a case in controversy with respect to state's challenge to the notice"), and Mont. Sulphur & Chem. Co. v. U.S. E.P.A., 666 F.3d 1174, 1183 (9th Cir. 2012) (holding that a SIP call that is not a final rule "is not a final agency action and [does] not impose any specific obligations"), with Virginia v. E.P.A., 108 F.3d 1397, 1414 (D.C. Cir. 1997) (reviewing a SIP Call where the call took the form of a final rule), and W. Va. Chamber of Commerce v. Browner, No. 98-1013, 1998 WL 827315, at *4 (4th Cir. Dec. 1, 1998) (unpublished) (holding that, because the EPA had issued a SIP Call as a final rule, "[t]here has now been final agency action; the case is now ripe for review").

When, as in this APA action, "the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish." Lujan, 504 U.S. at 562 (internal quotation marks omitted). "In a case like this, in which relief for the petitioner depends on actions by a third party not before the court, the petitioner must demonstrate that a favorable decision would create 'a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered.'" Klamath Water Users Ass'n v. F.E.R.C., 534 F.3d 735, 739 (D.C. Cir. 2009) (citing Utah v. Evans, 536 U.S. 452, 464 (2002)); Lujan, 504 U.S. at 561 ("it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision") (citations and internal quotations omitted). When redressibility depends on a third party and there is no evidence suggesting a likelihood that the third party will take the action necessary to afford the plaintiff relief, the plaintiff lacks standing. For example, in US Ecology, Inc. v. U.S. Dep't of the Interior, 231 F.3d 20 (D.C. Cir. 2000), the plaintiff sued the Interior Department for refusing to transfer federal land to the state of California—land the plaintiff planned to use to build a waste facility. The D.C. Circuit noted that even if Interior's refusal were wrongful, the plaintiff's "alleged injury would not be redressable unless and until California accepted transfer of the disputed land and elected to proceed with the . . . project." Id. at 21. Because "[o]n the record at hand, [the plaintiff had] no grounds upon which to claim that

16

California [would] follow these courses," the court dismissed the case for lack of standing. Id.

Conversely, "[t]here will, of course, be occasions on which an order directed to a party before the court will significantly increase the chances of favorable action by a non-party." Klamath Water Users, 534 F.3d at 739. In National Parks Conservation Ass'n v. Manson, 414 F.3d 1, 6 (D.C. Cir. 2005), the D.C. Circuit held that "a district court order setting aside [an agency's nonbinding letter] would significantly affect [the state's] ongoing proceedings," in that the state would consider and likely be influenced by the letter. "That is enough to satisfy redressability." Id. at 6-7. Thus, if a party can show that a favorable decision is likely to redress their injury—that is, a favorable decision would significantly increase the chances of favorable action by a non-party—the party has standing to pursue its claim.

Under this standard, US Magnesium adequately demonstrated its standing through the Bird Declaration, wherein the Director of UDAQ states that, "if this Court were to invalidate EPA's SIP Call, there would be no need for UDAQ to revise the UBR and the existing UBR could be left in place." Pet. Reply Br. at 31. The Bird Declaration does not explicitly say that UDAQ would necessarily abandon its effort to revise the UBR if we were to invalidate the SIP Call. But the Bird Declaration, coupled with Utah's stated opposition to the SIP Call, strongly suggests that the SIP Call will significantly affect Utah's decision to

17

revise the UBR. Moreover, US Magnesium need not show that Utah would not proceed with the UBR reform absent the SIP Call. Even if Utah would proceed, the evidence suggests that Utah would likely adopt a different UBR if the EPA were not forcing its hand. Indeed, Utah already tried to adopt a new UBR, which the EPA rejected. Because the SIP Call significantly affects Utah's decision-making process, and because we find that a decision overturning the SIP Call would significantly increase the chances of action by Utah that is favorable to US Magnesium, we hold that US Magnesium has standing in this case.

*C. The Administrative Record adequately supports the EPA's conclusion that the UBR rendered the Utah SIP substantially inadequate.*

US Magnesium argues that the EPA generally failed to support the SIP Call with adequate facts in the record. To support this argument, US Magnesium argues that the CAA's language, requiring the EPA to find a SIP "is substantially inadequate to attain or maintain the relevant [NAAQS] . . . or to otherwise comply with any requirement of [the CAA]" before issuing a SIP Call, 42 U.S.C. § 7410(k)(5), requires the EPA to set out facts showing that the UBR has prevented Utah from attaining or maintaining the NAAQS or otherwise complying with the CAA.[3] US Magnesium goes on to argue that the EPA failed to set forth

---

[3] US Magnesium also argues that the EPA failed to define the term "substantially inadequate," but it raises this argument for the first time in its opening brief. Because US Magnesium did not raise this argument in its

18

such facts, and thus the rulemaking was arbitrary and capricious.

In response to US Magnesium's core argument that the EPA was required to set out specific facts supporting its finding of substantial inadequacy, the EPA states that it need not identify particular facts, as long as it could make a general showing that the SIP failed "to attain or maintain the NAAQS or otherwise comply with all other CAA requirements." Res. Br. at 24. This is in keeping with the EPA's reasoning in its SIP Call; in its proposed rule, the EPA stated that it interpreted 42 U.S.C. § 7410(k)(5) to allow a SIP Call if the EPA determined that aspects of the SIP undermined the fundamental integrity of the CAA's SIP process and structure, regardless of whether or not the EPA could point to specific instances where the SIP allowed violations of the NAAQS.

We analyze the EPA's interpretation of 42 U.S.C. § 7410(k)(5), a statute it is charged with administering, under the Chevron standard. 467 U.S. at 837. Proceeding under the first prong of Chevron, the statute is ambiguous about the question at issue. Ariz. Pub. Serv. Co., 562 F.3d at 1122 (internal quotation marks and citations omitted). On it face, the statute says nothing about whether the agency is required to make a specific factual finding about a state's current SIP before calling the SIP. Moreover, the legislative history does not clarify the

---

comments on the proposed rule, it cannot raise it now. Wilson v. Hodel, 758 F.2d 1369, 1373 (10th Cir. 1985) ("[A] reviewing court will not consider contentions which were not pressed upon the administrative agency."); see also Silverton Snowmobile Club v. U.S. Forest Serv., 433 F.3d 772, 783 (10th Cir. 2006).

statute. Although US Magnesium cites some legislative history purporting to show that Congress expected the EPA to make specific factual findings, that legislative history came from passage of the 1970 CAA, which did not have a section equivalent to CAA § 110(k)(5), 42 U.S.C. § 7410(k)(5). That section was added as part of the 1990 CAA amendments, so the 1970 legislative history is inapposite.

Because the statute is ambiguous, we turn to the second prong of Chevron, where we defer to the authorized agency and apply the agency's construction so long as it is a reasonable interpretation of the statute. Ariz. Pub. Serv. Co., 562 F.3d at 1122. Certainly, a SIP could be deemed substantially inadequate because air-quality records showed that actions permitted under the SIP resulted in NAAQS violations, but the statute can likewise apply to a situation like this, where the EPA determines that a SIP is no longer consistent with the EPA's understanding of the CAA. In such a case, the CAA permits the EPA to find that a SIP is substantially inadequate to comply with the CAA, which would allow the EPA to issue a SIP Call under CAA § 110(k)(5), 42 U.S.C. § 7410(k)(5). And if the CAA does not require specific factual findings to support a SIP Call, then the EPA was not derelict in failing to provide specific factual findings to support the SIP Call in this case. Thus, we reject US Magnesium's argument that the administrative record does not adequately support the EPA's conclusion that the Utah SIP is substantially inadequate.

20

*D.  The EPA's purported reliance on policy statements
not adopted through rulemaking procedures does not
render the SIP Call arbitrary and capricious.*

Next, US Magnesium argues that

> EPA treated the [Herman Memorandum] as if it were a
> legislative rule, binding upon the states and enforceable
> against the regulated industry.  Such treatment is arbitrary
> and capricious in that the [Herman Memorandum] has
> never been elevated to the status of a rule through notice-
> and-comment rulemaking.

Pet. Br. at 32.  The EPA responded by agreeing that its Herman Memorandum was a nonbinding policy statement, not a legislative rule, and then by arguing that it treated the memorandum as a policy statement and did not rely on it in the rulemaking other than as a statement of the EPA's interpretation of the CAA.  This approach is consistent with the EPA's statements in the final rule, where it stated that "[w]e have not treated [the memorandum] as binding on the States or asserted that it changed existing SIP provisions.  Instead, we have done what commenters argue is necessary—we have engaged in notice and comment rulemaking to determine whether a SIP Call is appropriate in this case."  JA at 6-7.  As outlined in the discussion of the rulemaking above, the EPA referenced the policy statements to explain its interpretation of the CAA, but did not attempt to rely on the statements as a rule of law in their own right.  This is in keeping with our precedent.  AMREP Corp. v. FTC, 768 F.2d 1171, 1179 (10th Cir. 1985) ("General policy statements . . . are merely public pronouncements of the policy that the agency plans to follow in rule-makings or adjudications. . . .  It is only

21

when a new standard set forth in a policy statement is adopted in a formal rule-making or adjudication that it becomes a binding norm.").

More broadly, the EPA did not, as US Magnesium alleges, merely rely on its own policy statements in determining that the UBR rendered the SIP substantially inadequate to comply with the CAA. As noted in the rule discussion, the EPA clearly explained its reasoning in determining that the UBR did not comport with the EPA's understanding of the CAA requirements. The EPA's references to its policy statements do not vitiate this explanation.

Finally, we approved of similarly limited reliance on the policies at issue here in <u>Arizona Public Service Co.</u> 562 F.3d at 1129 (deferring to the Herman Memorandum, which the EPA relied on to justify, in part, the rejection of a proposed malfunction exemption plan from the Arizona Public Service Co.). Likewise, in the present case the EPA did not inappropriately rely on its policy statements.

### E. The EPA's SIP Call is not inconsistent with its own policy statements and regulations.

US Magnesium's final argument is that the EPA's SIP Call is arbitrary and capricious because the EPA: (1) failed to follow the Schaeffer Memorandum's limits on the Herman Memorandum; (2) failed to acknowledge that the UBR is actually consistent with the Herman Memorandum; and (3) failed to acknowledge that the UBR is consistent with the EPA's own breakdown regulations. These arguments also fail.

22

The Schaeffer Memorandum states that the Herman Memorandum "was not intended to alter the status of any existing malfunction, startup or shutdown provision in a SIP that has been approved by the EPA. . . . Rather, it is in the context of future rulemaking actions, such as the SIP approval process, that the EPA will consider the Guidance and the statutory principles on which the Guidance is based." JA at 131. From this language, US Magnesium surmises that the Schaeffer Memorandum forbids the UBR's alleged inconsistency with the CAA interpretation expressed in the Herman Memorandum from justifying a SIP Call. As the EPA suggests, this argument is specious. The EPA is not suggesting that the Herman Memorandum altered the law. Instead, the EPA has promulgated a new SIP Call, through notice-and-comment rulemaking, that applies the statutory interpretation first embodied in the Herman Memorandum to the Utah UBR. This appears to be the kind of use of the Herman Memorandum that the Schaeffer Memorandum envisioned when it stated that "it is in the context of future rulemaking actions, such as the SIP approval process, that the EPA will consider the Guidance and the statutory principles on which the Guidance is based." Id. at 131; see Sierra Club v. Ga. Power Co., 443 F.3d 1346, 1353-55 (11th Cir. 2006) (noting that, "[i]f the EPA believes that its current interpretation of the Clean Air Act requires Georgia to modify its [Breakdown] Rule, the EPA should require the state to revise its SIP to conform to EPA policy"). The EPA's actions here were not inconsistent with the Schaeffer Memorandum.

23

US Magnesium next argues that the EPA failed to acknowledge that the UBR is actually consistent with the Herman Memorandum. US Magnesium makes three specific arguments about the EPA's conclusions: (1) the EPA's reasoning in the final rule that the UBR may not exclude from exemption recurring breakdowns due to inadequate design, operation, or maintenance of air-quality controls is merely speculative; (2) the EPA incorrectly argues that the UBR does not indicate who bears the burden of proof regarding claims that a breakdown was unavoidable; and (3) the EPA incorrectly concludes that the UBR may be read to give the UDAQ secretary the exclusive authority to determine whether a violation has occurred. All three arguments turn on whether the EPA should have the power to call a SIP in order to clarify language in the SIP that could be read to violate the CAA, when a court has not yet interpreted the language in that way.

In its final rule, the EPA cites several cases where a court has interpreted provisions in a SIP to limit the EPA's CAA enforcement authority in the face of more generous state standards. JA at 10 n.20 (citing United States v. Ford Motor Co., 736 F. Supp. 1539 (W.D. Mo. 1990); United States v. General Motors Corp., 702 F. Supp. 133 (N.D. Tex. 1988) (EPA could not pursue direct enforcement of SIP emission limits where states had approved alternative limits under procedures EPA had approved in the SIP); Fla. Power & Light Co. v. Costle, 650 F.2d 579, 588 (5th Cir. 1981) (EPA to be accorded no discretion in interpreting state law)).

24

The EPA stated, "[w]hile we do not agree with the holdings of these cases, we think the reasonable course is to eliminate any uncertainty about reserved enforcement authority by requiring the State to revise or remove the unavoidable breakdown rule from the SIP." JA at 10 n.20. In light of the potential conflicts between Utah's SIP and the EPA's reasonable interpretation of the CAA requirements, seeking revision of the SIP was prudent, not arbitrary or capricious.

Finally, US Magnesium argues that the EPA failed to acknowledge that the UBR is consistent with the EPA's own breakdown regulations in the NSPS and that the EPA's position with respect to Sierra Club v. EPA, 551 F.3d 1019 (D.C. Cir. 2008), precludes the EPA's efforts to use that case to support the SIP Call. Neither argument is credible.

First, as the EPA notes in its response, the NSPS standards are technology-based, while the NAAQS standards addressed in the SIP are health-based. In the past, the EPA had a policy allowing exemptions for technology-based standards, but not for health-based standards. However, the EPA has now begun promulgation of new rules to eliminate the technology-based breakdown exemptions, in light of the D.C. Circuit's ruling that the CAA requires continuous compliance with some NSPS emission standards, such that the breakdown exemption was illegal under the CAA. Id. Because the EPA has abandoned its former interpretation, any inconsistency between EPA's former breakdown exemptions and this SIP Call does not render the call arbitrary and capricious.

25

Second, US Magnesium argues that the EPA's use of Sierra Club to support the SIP Call is inconsistent with the EPA's views on Sierra Club. This may have been true with respect to the EPA's initial views on Sierra Club, but it no longer appears to be the case. In Sierra Club, the D.C. Circuit held that the CAA requires continuous compliance with MACT emission standards, striking down an EPA rule that created a breakdown exemption to the MACT standards. US Magnesium cites to a letter from an EPA official narrowly construing Sierra Club as only applying to the regulations at issue in that case, arguing that this narrow construction suggests that the EPA did not believe that Sierra Club had any impact on rules like the UBR at issue here. US Magnesium suggests that this conflicts with the EPA's arguments in the SIP Call, where the EPA maintained that Sierra Club requires all emissions limitations to be continuous. However, the EPA's promulgation of new NSPS rules based on the Sierra Club decision suggests it now accepts Sierra Club's broader implication—that all emission limitations must be continuous. Indeed, the letter from the EPA official quoted by US Magnesium went on to discuss the EPA's intention to evaluate other standards in light of Sierra Club. Thus the EPA's present position on Sierra Club is consistent with its SIP Call.

### III

Accordingly, we DENY US Magnesium's petition for review of the Utah SIP Call.

26

11-9533 - *US Magnesium, LLC v. United States Environmental Protection Agency*

**HARTZ**, Circuit Judge, concurring:

I agree that US Magnesium must be denied relief, but my reasons differ from those of the majority. In my view, US Magnesium lacks standing because it has failed to make the necessary showing that its alleged injury would be redressed by a favorable decision.

My disagreement with the majority is not regarding the legal standard for redressability. As the majority opinion accurately states, when, as here, "'the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but is ordinarily substantially more difficult to establish.'" Op. at 15 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992)). *Lujan* explains that in this circumstance,

> [t]he existence of . . . standing depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict, and it becomes the burden of the plaintiff to adduce facts showing that those choices . . . will be made in such manner as to . . . permit redressability of injury.

*Lujan*, 504 U.S. at 562 (citations and internal quotation marks omitted). Thus, the majority opinion is correct when it states that to establish redressability, the plaintiff must show that "'it [is] likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision,'" Op. at 15 (quoting *Lujan*, 504 U.S. at 561), and that "[w]hen redressibility depends on a third party and there is

no evidence suggesting a likelihood that the third party will take the action necessary to afford the plaintiff relief, the plaintiff lacks standing." *Id.*

Where I differ from the majority is in the application of these principles to the present case. US Magnesium's purpose in this litigation is to prevent Utah from modifying its regulations regarding unavoidable breakdowns (the UBR regulations). US Magnesium hopes that a ruling by this court freeing Utah from the EPA requirement that it revise its regulations will cause Utah to halt its ongoing rule-revision proceedings and keep its present regulations. On the record before us, however, that possibility is merely speculation.

US Magnesium has failed "to adduce facts showing" that a favorable decision in this case will lead Utah to abandon its proceedings to revise its UBR regulations. It fails to show Utah's intent in that regard or any reason for Utah to halt the revision process. For intent, it relies on an affidavit it obtained from Bryce Byrd, director of the Utah Division of Air Quality. His predictions of how the state would respond to a favorable decision in this case would certainly be worthy of substantial weight. If the affidavit stated that Utah would likely abandon its revision proceedings, redressability would be established. But it does no such thing. It states: "[I]f this Court were to invalidate EPA's SIP Call, there would be no need for UDAQ to revise the UBR and the existing UBR could be left in place." Decl. of Bryce C. Bird, ¶ 20 (Aplt./Pet'r's Reply Br. at 38). This is not a statement of intent. All this sentence of the affidavit does is note the

-2-

obvious legal effect of a ruling favorable to US Magnesium.  To say that "there would be no need" to revise the regulation does not tell us whether the state would halt its revision efforts.  Indeed, the very fact that the affidavit does not assert the state's intentions, when it would have substantially benefitted US Magnesium to have such an assertion, implies that the state is, at the very least, undecided on whether it would proceed with its revision proceedings.  At most, as expressed by US Magnesium at our oral argument, "We just don't know for sure"—because "just like courts don't issue advisory opinions, the agency's not going to go as far as to completely play its hand about what it might do depending on how the remand will come down."  Oral Arg. at 9:35-9:47.  I note, however, that I can see no reason why the state would not want to play its hand publicly if it wished to abandon the revision process, especially when a definitive statement would assist US Magnesium in its efforts to overturn the SIP Call.

Nor does the Byrd affidavit otherwise suggest that the state would halt its revision proceedings.  True, the affidavit says that "UDAQ maintains its belief that EPA mandated that Utah revise or remove the UBR from the Utah SIP without adequate legal foundation and pursuant to a misinterpretation of the UBR."  *Id.*  Significantly, however, the affidavit does not say that the state disagrees with the EPA regarding the substantive requirements of federal law (as opposed to the requirements for issuing an SIP Call).  Rather, its position is that the EPA has *misinterpreted* the state's regulations as contrary to federal law when

-3-

they in fact are not.  Although the state may have wished to make a point about the EPA's power to issue a SIP Call, it is not clear why Utah would not now want to continue with the process of removing ambiguity from its regulations.  In this regard, I find it significant that Utah did not itself pursue an appeal from the EPA decision.  Of course, the decision may have been based in part on an assessment of how best to use limited legal resources; but an e-mail of Mr. Byrd attached to the EPA brief states that the decision not to appeal "was generally supported through information gained through the stakeholder process," Aplee./Resp't Br., add. at 150, and stakeholders would be unlikely to concern themselves with allocation of agency legal resources.

Finally, US Magnesium itself does not argue that the EPA is forcing Utah to make revisions to its rules that would be contrary to what is required by federal law.  US Magnesium's real complaint about the EPA is that no SIP Call was necessary, a complaint with which one could sympathize.  But in supporting that complaint, US Magnesium, particularly in its reply brief, repeatedly argues that the Utah regulations, if properly construed, are fully consistent with the EPA's view of the requirements of federal law.  *See* Aplt./Pet'r's Br. at 36–40; Aplt./Pet'r's Reply Br. at 10–11, 16–22.  That position was further echoed by US Magnesium at oral argument (the most relevant portion of which is transcribed in a footnote at the end of this dissent).  The only criticism of the EPA's interpretation of federal law raised at oral argument was that the EPA's

-4-

interpretation of one aspect of federal law—an interpretation that concededly is entitled to *Chevron* deference—would not justify a SIP Call. *See* Oral Arg. at 12:49-13:31 ("Counsel: Within the context of the EPA interpreting the Clean Air Act you would give them *Chevron* deference in interpreting that. But that deference being applied in the instance of developing or approving a SIP is not the same as EPA saying it's substantially inadequate. That's a completely different standard. There's room for inadequacy. But it's got to be substantial before we're going to go down this path, and spend our time, and force the state to change its rules that have existed for this many years. We're going to pick real issues that have a real impact. ") *See also* Aplt./Pet'r's Br. at 20 n.5 (making similar point). It seems to me unlikely that Utah would halt its revision process if it agrees that the process will eliminate ambiguities and conform to undisputed federal law. In any event, US Magnesium has not met its burden of showing that Utah would do so.

For these reasons, I cannot join the majority opinion.[1]

---

[1] Magnesium v. EPA, oral argument transcript, starting at 5:28:

Court:    Let me approach this case from a different perspective. It's not at all clear to me what this case is supposed to accomplish except maybe make a point. As I understand your briefing, your complaint is that the EPA wants to change the language in the SIP to make things perhaps more precise. And you're saying those changes are unnecessary because the state regulations would be interpreted that way anyway—that the changes that EPA wants to impose really won't accomplish anything. Am I correct?

Counsel:    That's correct, your honor.  I think we're really talking about—

Court:      Why litigate that?  What purpose is served when you're complaining that they're trying to remove ambiguity from state rules and to remove the ambiguity and make it clear that it means something which you say it already means?  So you're upset at EPA:  they wasted everybody's time requiring clarification of something that didn't need clarifying.  But then you're wasting everybody's time saying it shouldn't be clarified, why are they doing this.  It's a pox on both your houses.  Why bother the courts about this?

Counsel:    Well, I wouldn't go quite so far.  From my client's perspective, it understands the state rule, it uses the state rule, and it does give it some protections.  And including—

Court:      So there are some changes you're saying? So these changes do make a difference?

Counsel:    I don't think they're going to—

Court:      The EPA requirements for the rule language changes will effect a substantive change in the rule?  I thought you were arguing to the contrary.

Counsel:    I think there are some changes, but I don't think they're that material in terms of—and here's the key point—what the actual emissions will be on the ground.  We're talking about EPA's burden.  And there's a principle at stake here, there's no doubt about it.  It's not just this case.  Because there are very few courts that have defined what it means to be substantially inadequate.

Court:      Here's one reason this is important: your standing.  Because if all this does is clarify what the Utah regulators thought it meant anyway, what makes you think that if you prevail here, Utah won't change its regulations anyway, or maybe it already has (I'm not sure what the status is). Are you going to get any relief except a declaration of some legal principle?

Counsel:    I think we get specific relief.  EPA's SIP call has forced Utah to go through a rulemaking to try to meet EPA's demands.

. . .

Counsel: If this court vacates the rule, that has an immediate impact. And we have a declaration from Bryce Bird, the director of the Air Quality Division of Utah, that if this court says EPA has not met the threshold—and again we're talking about a statutory threshold—then Utah does not have to continue this process.

Court: What he says is Utah doesn't have to continue the process. It doesn't say that we won't decide to clarify the language, because they may think it's good to clarify the language.

Counsel: I think in fairness to him and his declaration, you're right. *Because just like courts don't issue advisory opinions, the agency's not going to go so far as to completely play its hand as to what it might do depending upon* how the remand comes down. We just don't know for sure. But we know that the state no longer has the pressure to do this; we know the state didn't want to do this and go through this effort. We know, frankly, EPA didn't have it as a high priority—it was only forced to do so by a citizens' group. So from that perspective EPA did not see this as a big issue that it had to solve on the ground in Utah. And that's the point. You've got to have a significant issue that's going to have some real effect on the ground.

Court: I agree. And that could be a problem with EPA taking the action. But now the ball's in your court and you're also asking us to do something that's not going to have much of an effect. Somebody's got to put a stop to this nonsense, all this wasted effort. Seems to me one way to do that is to say that there's no reason to see that you have standing here.

Counsel: I think there is standing, because but for EPA issuing this order and it told Utah what it has to do, and it's got to change this rule—and that rule will change the way my client interacts with the rule and interacts with the agency and it has potential enforcement implications. I don't think those are going to change, though, the actual emissions. In fact, it's EPA's burden to prove that and that's what this case is about. If EPA can rely upon generic policy statements that could be ever-changing, then it could be messing with these SIPs and be forced to mess with these SIPs by NGOs, through

this very action.

Court: But to make clear—I don't want to belabor this too much—you don't really disagree with that policy statement, do you?

Counsel: EPA's policy statement?

Court: The policy statement saying that even though you're excused because it's an unavoidable mishap that still there should be some discretion to enforce if it's one of the few sources of a pollutant that may exceed federal requirements, and that even if you do comply there still may be a right to bring an injunctive action either by EPA or by private citizens.

Counsel: I think there's room within the Clean Air Act to have a reasonable interpretation on the other side of that. And if we're talking about what is a reasonable interpretation, and there's room to have both sides of that, that's different than saying this plan is substantially inadequate. This ambiguity—of what the interpretation is and what the policy is—exists. It's been discussed. It's been litigated. But that ambiguity does not cross the threshold of substantial inadequacy, your honor. That's our position. That word has to mean something and it has to be significant before we're going to start down this path. We didn't have to go down this path but here we are.

Court: They use their policy statements to determine the inadequacy, correct?

Counsel: Yes.

Court: And don't we give their policy statements *Chevron* deference, or not?

Counsel: *Within the context of EPA interpreting the Clean Air Act you would give them Chevron deference in interpreting that. However, that deference being applied in the instance of developing a SIP or approving a SIP is not the same as EPA saying it's substantially inadequate on the [unintelligible]. That's a completely different standard. There's room for inadequacy. It's got to be substantial before we're going to go down this path, and spend our time, and force the state to change its rules that have existed for this many*

(emphasis added)